909 F.2d 1483
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Diane ILES, Plaintiff-Appellant,
v.
LOGO PARIS, INC., Defendant-Appellee.
 No. 89-2136.
 United States Court of Appeals, Sixth Circuit.
 Aug. 6, 1990.
 
 Before KENNEDY and MILBURN, Circuit Judges, and CONTIE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Appellant Diane Iles, a former sales consultant for appellee Logo Paris, Inc. (Logo), appeals the summary judgment dismissal of her complaint alleging wrongful discharge in violation of her implied termination for cause employment contract. The District Court held that Iles, as a matter of law, was an at-will employee. In the alternative, the court found that no reasonable jury could find that Iles was terminated other than because of her poor sales performance, a proper justification for discharge under Michigan law. Iles asserts that there remain questions of material fact on both issues and, accordingly, that the District Court's grant of summary judgment should be reversed. Because we agree that Iles was terminated for poor sales performance, a just cause reason for termination under Michigan law, we AFFIRM.
 
 I. Background
 
 2
 Logo manufactures and sells designer eyeglass frames across the country. For sales purposes, Logo has divided the country into four sales regions. Each region is subdivided into approximately 15 territories. The territories of each region are then assigned to a sales consultant who is primarily responsible for soliciting sales from customers in the region.[1]
 
 
 3
 In April 1982, Iles was hired by Logo as a sales consultant for territory 17 in region B. Essentially, this territory covered the southeast quadrant of Michigan, including Lansing, Flint, and the Detroit metropolitan area. At the commencement of her employment, appellant was sent a letter outlining the terms and conditions of her employment. The letter stated that Iles was to be a probationary employee for her first 90 days. During this time, the letter stated that Iles could be discharged for any reason. Following her probation, Iles was to become a "permanent" employee. The letter set forth a number of other terms and conditions concerning her employment. One of these terms provided that Logo reserved the right to change all the terms by giving Iles two weeks notice.
 
 
 4
 During her first few weeks on the job, Iles alleges that various Logo supervisors and trainers told her that she would have a job with Logo as long as she did a good job. Although much of the language used by the supervisors was not as clear as this, even the statements that were this clear were made in the context of pep talks about the company and Iles' ability to succeed in her new position.
 
 
 5
 During most of her career with Logo, Iles was by all accounts an excellent employee. During her first year, Iles was honored as "Rookie of the Year." In 1987, however, Iles' performance began to decline. The primary indication of this was her declining sales. Additionally, her supervisor suspected that she lacked motivation and was only working for sales in her larger, more prosperous accounts. One basis for this suspicion was the fact that Iles was not meeting the established minimum number of sales calls. Although Iles asserts that she was not subject to the minimum, it is undisputed that she was told to meet these minimums at various times in 1987 and 1988. Accordingly, since Logo reserved the right to unilaterally change terms of her contract, Iles was required to meet the minimum. In September 1987, Iles was placed on probation because of her poor performance. Her sales improved somewhat after this, but nevertheless, she had the worst percentage decline in sales of any sales representative in region B from 1986 to 1987.
 
 
 6
 As a result of her poor sales in the prior year, Iles either remained or was again placed on probation in January 1988. Her sales improved substantially during January, but then fell even more dramatically the following month. Moreover, because she was not making the required minimum number of sales calls or working a full five-day work week during February, her supervisor felt that Iles was not motivated to continue improving her sales. Accordingly, Iles was discharged in March 1988 because of her poor sales.
 
 II. Discussion
 
 7
 In reviewing a district court's grant of summary judgment, we review de novo the District Court's finding that no material issue of fact is left to be decided. Burkart v. Post-Browning, Inc., 859 F.2d 1245, 1249 (6th Cir.1988). In order to prevail, the moving party must demonstrate "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment must initially inform the court of the basis for its motion and identify those portions of the record that demonstrate the absence of a material issue of fact. The nonmoving party must then go beyond the pleadings and demonstrate what genuine issues of material fact are left to be decided at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). The evidence must be viewed in a light most favorable to the nonmoving party. Accordingly, the nonmoving party must be given the benefit of any reasonable inference in his or her favor that could be drawn from the evidence.
 
 
 8
 Appellant's cause of action in this case is based on Toussaint v. Blue Cross & Blue Shield of Michigan, 408 Mich. 579, 598 (1980). As a general rule, "[e]mployers and employees remain free to provide, or not to provide, for job security. Absent a contractual provision for job security, either the employer or the employee may ordinarily terminate an employment contract at any time for any, or no, reason." Valentine v. General American Credit, Inc., 420 Mich. 256, 258-59 (1984). Under Toussaint, an employer can adopt a policy of discharge only for cause either formally, through writings such as an employee policy manual or an employment contract, or informally, through oral statements or less formal written statements. Toussaint, 408 Mich. at 598-99.
 
 
 9
 In support of her contention that Logo had established a just cause termination policy, appellant cites three factors: (1) a series of statements made to her by company officials immediately prior to and during her employment; (2) the actual termination practices of Logo when it exercised its discharge powers; and (3) the terms of her employment contract. Because we conclude that no reasonable jury could find that Iles was terminated other than for just cause, we need not decide whether a contract actually arose.
 
 
 10
 Logo argues that even if a just cause employment relationship existed, there is no material dispute over the fact that just cause to terminate Iles existed. It is Logo's position that Iles was terminated because of her poor sales performance. Iles does not have an explanation for her firing. She rests on her allegation that Logo's asserted reasons either were not reasonable or do not serve as a sufficient justification for discharge.[2]
 
 
 11
 Logo measured an employee's performance against that same employee's performance in the prior year. Logo required its sales staff to do more than meet the prior year's sales, however. Generally, employees were required to exceed prior year's sales by an assigned percentage. The company initially sets a percentage increase for an entire sales region. In 1988, region B was assigned a 25% increase in sales.[3] Individual sellers within each region are then assigned a percentage increase based on the company's perception of the territory's potential for growth--keeping in mind the assigned percentage increase targeted for the entire region.
 
 
 12
 Iles' 1987 Territory Sales Monitoring Report states that Iles' 1987 goal was to sell 21,177 pieces. It reflects that Iles' actual sales were 11,897 pieces and her sales in the prior year were 14,953. Accordingly, the report listed her sales over the course of the year as down 20.4%. Joint App. at 424. Iles admits that these figures are correct, but suggests that they are misleading for three reasons. First, she argues that despite the decline in her sales that she was still the best seller in her region for the year when one compares absolute sales and dollar volume. Although her assertion is true, it misses the point. Since each sales representative works a different sales territory, it is impossible to compare one sales territory to another. Accordingly, the company measures sales performance by comparing each sales representative's performance to his or her sales performance during the same period in the prior year. The company also compares this performance to the representative's assigned goal. Accordingly, the company is correct when it asserts that an absolute comparison of dollar or sales volume figures is meaningless.
 
 
 13
 Second, Iles asserts that these figures do not take into account two reductions in the size of her territory during 1987. Apparently, Iles' territory was reduced twice in 1987, once in the spring by removing the city of Southfield and once later in the year when the First Optometry account was transferred to another employee who had worked with First Optometry's buyer.[4] The records on their face do not reflect whether the sales figures for the prior year have been adjusted to take into account the change. However, Logo submitted the affidavit of Harry Mangos, Iles' supervisor at the time of her termination and the manager of region B, who certified that the sales figures contained in these records have been corrected to incorporate the two changes in Iles' territory in 1987.[5] Joint App. at 185. Iles has produced nothing other than the assertion in her brief that this is not the case. Iles cannot contest an affidavit without more. Accordingly, we must reject her assertion that the records do not reflect the change in her territory.[6]
 
 
 14
 Finally, Iles asserts that her 1987 sales decrease is related to documented medical problems she suffered in October 1987 which prevented her from traveling.[7] Iles informed Logo of these problems at the time and Logo apparently conceded that her problems cut into her sales during that month. October 1987 was only Iles' fourth worst month of the year, however. Even if Iles had October 1987 sales equal to her October 1986 sales, she still would have been the second worst employee in her region for the year in terms of percentage change in sales. Her sales for the year would still have been down by approximately 16.5%. Further, it does not explain the fact that her sales were down considerably--more than 24%--in September 1987 when she was first placed on probation.
 
 
 15
 Iles was assigned a 22-25% increase in her sales for 1988, clearly in line with the 25% increase required of the region as a whole. Joint App. at 346, 351.[8] At the beginning of January 1988, she was informed that her period of probation was being extended because of her poor 1987 sales. Iles was also told that she should strive to meet her assigned sales goal and should meet the company-required 30 sales calls per week, as well as work a full-time schedule.[9] Iles admitted that she understood her job was on the line. In January 1988, Iles came close to achieving her assigned goals, her sales were up 21.9% over January of the prior year and her evaluation noted that she was putting in a full work week. Joint App. at 349. She apparently made the required 30 sales calls only once, however. Joint App. at 186, 331. Although praising her January achievements in a February 12, 1988 letter, Iles' supervisor nevertheless determined that she should stay on probation for another month. Joint App. at 349.
 
 
 16
 Iles' sales fell off dramatically in February 1988. She explained in her deposition that she quit trying to improve her performance in February because she subjectively believed after being placed on probation for another month that the company was looking for a reason to terminate her. Her only basis for the belief was that she had not received sufficient praise for her improved performance in January. Joint App. at 331. There is no evidence in the record that a decision was made to terminate Iles regardless of her February performance. Whatever the explanation, her February sales fell 38.6% from the previous February. Joint App. at 352. Her combined sales for the first two months of the year were off almost 15%. Finally, Iles only worked an average of 3.75 days per week in February. She only made an average of 20.25 sales calls per week, almost one-third less than the number she admits she was required to make. Joint App. at 352.
 
 
 17
 During the same two month period, overall sales for region B were up more than 18%. Joint App. at 186. Overall, Iles' sales were the second worst in the region. The individual who had a worst performance was not on probation, had outperformed Iles during the prior year, and had a 72% increase in sales during the following month. Joint App. at 186. Iles was terminated shortly after her February performance was evaluated.
 
 
 18
 Examining all of these factors, we do not believe a reasonable jury could conclude that Iles was fired other than for just cause. Although Iles asserts that the method used for evaluating her performance (percentage change in sales over the prior year) was not reasonable and alleges that the company's sales expectations for her were unreasonable, she supports these statements with little more than her own assertion that a different evaluation method should have been used. We believe that employers are allowed to establish facially reasonable, uniform methods for evaluating similarly situated employees even though another employer or the jury might have established a different method. See Toussaint, 408 Mich. at 623 (employers "must be permitted to establish their own [uniformly applied] standards for job performance and to dismiss for standards for non-adherence to those standards"). The evaluation system utilized by Logo for evaluating Iles' performance is not unreasonable and was uniformly applied. To the extent Iles argues she had a reasonable expectation that she would be judged by a different standard, it is clear that Logo reserved the right to unilaterally impose changes regardless of Iles' expectations. There is no question that Iles was informed of the company's expectations when she was placed on probation.
 
 
 19
 Although Iles asserts that a jury question is presented on the issue of whether this evaluation system and the discipline which resulted from it were applied fairly in her specific case, we believe that no reasonable jury could conclude on this record that Iles was terminated for any reason other than poor job performance. Her sales were down dramatically in 1987. Although other employees had also experienced declines in their sales, none experienced a decline as severe as Iles'. When Iles' probation was continued in January 1988, after a year-end review of her performance, her sales initially picked up, only to fall off dramatically in February 1988. Moreover, during her final month, Iles was not working a full week and was not meeting her required number of sales calls. One would expect an employee who has been explicitly instructed to put in a full work week and to meet company minimums for sales calls would make the required effort. An employer has just cause to terminate an employee who inexplicably fails to put in full work weeks, fails to comply with explicit instructions to make required sales calls, and who is experiencing short term and long term declines in sales not reflective of the market conditions encountered by other employees in the area.[10] Even if Iles had the right not to be terminated except for just cause, a reasonable jury could not find that Logo breached such an agreement.
 
 III. Conclusion
 
 20
 Accordingly, the judgment of the District Court is AFFIRMED.
 
 
 
 [1]
 Logo also has accounts in most territories it designates "house accounts." These accounts are apparently not handled by the sales consultants
 
 
 [2]
 In her reply brief, Iles suggests that she may have been marked for termination when she complained in 1987 about two adjustments Logo made to her sales territory. Although it is true that her complaints were rebuffed, there is no reason to believe that the her complaints precipitated her discharge six months later. This is particularly true where her supervisor was changed shortly after her complaints were resolved. Thus, even if the individual to whom she had initially complained became biased against her, that supervisor's bias did not enter into the decision. Although she alleges that her new supervisor was "informed of the company's displeasure" with her, she has no basis for such an accusation despite taking the depositions of both supervisors
 
 
 [3]
 Region B did not accomplish its 25% increase goal. Actual sales for 1988 only increased 10%. Joint App. at 423. Apparently, the "goals" were often not accomplished. An examination of 1987 Territory Sales Monitoring Reports for region B reveals that none of the representatives met their goals. Joint App. at 424-32. None fell as far short as did the appellant, however. Moreover, during the two months that the appellant was employed in 1988, her overall sales were down almost 15% while the region as a whole was up 18%. Joint App. at 185
 
 
 [4]
 Apparently, the First Optometry account amounted to less than 100 pieces annually of Iles' business. Joint App. at 328. It is difficult to see how this resulted in a substantial reduction in her sales. The sales losses attributable to the removal of Southfield are more difficult to quantify on the record before us
 
 
 [5]
 Apparently, Iles' sales goal was not changed to reflect the changes in her territory. Accordingly, we do not believe it is appropriate to rely on the target figure as a basis for summary judgment since it is impossible to tell on this record how much of the goal was attributable to these portions of her territory
 
 
 [6]
 Iles also asserts that she was not given proper time to develop evidence to rebut the Territory Sales Monitoring Reports since they were not produced prior to the motion for summary judgment. She has not stated what additional evidence she could develop in opposition to this information, however. Nor did she request additional time from the District Court to conduct additional discovery to respond to the sales figures or to Mangos' affidavit. Appellant's only statement in response to this portion of Mangos' affidavit was that it was inconsistent with his deposition. Joint App. at 205. Although Iles has apparently abandoned this argument, to the extent she has not, we find no inconsistency. See Joint App. at 407-10
 
 
 [7]
 The record reveals that Iles had 12 days off with medical problems. Joint App. at 344
 
 
 [8]
 Logo has attached to its brief on appeal (appendix A) several copies of company records not appearing in the record below. Because the information is not part of the record in this case, we have not relied on it to resolve this or any other issue in the case
 
 
 [9]
 Harry Mangos became Iles' new supervisor in December 1987, replacing Judi Blondell, who had first placed Iles on probation
 
 
 [10]
 Further, Iles cannot rely on her subjective and unfounded belief that a decision had already been made to terminate her as a basis to explain her declining performance. Were this the case, then any employee fired for poor performance could escape summary judgment merely by asserting that he or she had a subjective belief that they were about to be fired that explained their poor performance. In any case, Iles' poor performance was of a long term nature